UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

D-4 DR. MARK V. BUZZARD,

    Defendant.
_____/

Case. No.  15-cr-20581

HON. JUDITH E. LEVY

**GOVERNMENT'S RESPONSE OPPOSING
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Now comes the United States of America, by and through its undersigned attorneys, and submits its response in opposition to Defendant's Motion for Compassionate Release (ECF 376).  Defendant Dr. Mark Buzzard filed a motion based on his current medical condition and the novel coronavirus pandemic (COVID-19).  He began serving his 72 month sentence at FCI Morgantown on September 25, 2018; and his projected release date is November 4, 2023.  He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  While the government understands his concern regarding the onset of the COVID-19 pandemic and despite his compelling and extraordinary circumstances, the Court should deny defendant's motion because the 3535(a) factors weigh against a reduction in his sentence.

1

## BACKGROUND

Dr. Buzzard owned and operated M V Buzzard M.D., P.C. (MVB), which was a psychiatric and addiction treatment clinic. MVB was registered as an Office-Based Opioid Treatment (OBOT) program, which was supposed to dispense certain narcotics for the maintenance and detoxification of opiate addicts. However, in reality, the practice operated to write prescriptions in exchange for cash payments. These prescriptions were filled not for a legitimate medical purpose, but rather to be sold on the illegal street market for a substantial profit.

Beginning in or about 2012, Dr. Buzzard agreed to issue prescriptions for Oxycodone and Oxymorphone, and other controlled substances without regard to medical necessity, to "patients" who were recruited by codefendant Joseph Roe. After conducting a cursory physical examination or no examination at all, he would write multiple prescriptions, without medical necessity, to the Roe patients. In addition to the Roe patients, Dr. Buzzard also provided prescriptions to other pain and psychiatric patients at his practice. The "pain management practice" at his office accounted for a substantial percentage of his patients – resulting in him prescribing more than 1.2 million addictive controlled substance narcotics from January 2012 to December 2015.

Dr. Buzzard's office exhibited a multitude of red flag indicators of opioid drug diversion and overprescribing. First, MBV operated as a "cash only" medical

practice. The cost of a patient appointment was determined by the "intensity of the visit" which meant that the more prescriptions received, the higher the fee for service (in other words, the higher the street value of the drug or the higher quantity prescribed, the more Dr. Buzzard would charge the patient). On average, Dr. Buzzard collected anywhere from $2,000 to $3,000 per day in cash payments. Patients had to pay for their prescriptions before they would be seen by the doctor to ensure that they had the money for what was going to be prescribed that day.

Additional red flag indicators that showed Dr. Buzzard was practicing outside the course of professional medical practice included:

- operation of the medical practice with absolutely no medical examination rooms at Dr. Buzzard's office;
- no vitals were taken of the patients;
- Dr. Buzzard performed very little or no diagnostic testing before prescribing extremely addictive opioids;
- no prior medical records or medical history was documented;
- no alternative treatments other than opioid prescribing was done;
- no reduction in medication or any attempts to reduce the amount prescribed;
- employees were seen as patients and prescribed controlled substances without any medical evaluation;
- patients were prescribed addictive opioids after "phone visits" without ever being seen in the office;
- patients out of state would have prescriptions sent to them via FedEx delivery without office visits;

3

- patients would receive prescriptions, even if they were also being prescribed control substances by other physicians (commonly known as "doctor shopping"); and

- Dr. Buzzard would continue to prescribe controlled substances despite warnings of overprescribing from insurance companies, and phone calls regarding patient overdoses and patients selling their prescriptions.

In 2013, Dr. Buzzard was investigated by the Michigan Department of Licensing and Regulatory Affairs (LARA). There was concern with Dr. Buzzard's prescribing habits. He was believed to be prescribing too many addictive opioids to patients without proper medical justification and/or without proper oversight and monitoring. As a result of that investigation, he was placed in a monitoring program. Despite this censure of his medical license, he continued to overprescribe and act outside the course of professional medical practice.

Arguably, the most egregious red flag of diversion was that Dr. Buzzard continued to prescribe opioid pain medication to patients that he knew were addicted to illicit street drugs. Among those patients was Raymond Worley, Jr. who Dr. Buzzard started seeing in 2012 for knee and back pain. Mr. Worley had a history of heroin abuse and Dr. Buzzard was aware of his struggles with addiction. Despite this, Dr. Buzzard consistently prescribed high doses of opioids even after hospitalizations for drug overdoses. Mr. Worley repetitively tested positive for illicit street drugs and negative for his prescribed medication. Despite this, Dr. Buzzard continued to prescribe him addictive opioids in substantial amounts. In

June 2015, Mr. Worley died as a result of taking the Oxycodone and Methadone prescribed by Dr. Buzzard.

On October 10, 2017, Dr. Buzzard pleaded guilty to the charged drug conspiracy; and on July 24, 2018, this Court sentenced him to a 72 month term of imprisonment and five years of supervised release. He began serving his custodial sentence at FCI Morgantown on September 25, 2018. His projected release date is November 4, 2023. Dr. Buzzard (age 54) suffers from hypertension, obesity with a BMI greater than 30, asthma and heart arrhythmia. On July 1, 2020, he filed a request for a Reduction in Sentence/Compassionate Release with the warden based on his medical conditions; which was later denied on July 21, 2020. After exhausting his administrative remedies, he then filed the instant motion with this Court.

## **LEGAL STANDARD**

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory

5

exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at the facility received the request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at *1–*4.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## ARGUMENT

The Court should deny Defendant's motion because although Dr. Buzzard has exhausted his administrative remedies and has compelling and extraordinary circumstances due to COVID-19, the 3535(a) factors weigh against a reduction in his sentence. "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Dr. Buzzard's heightened risk from COVID-19 based on his BMI of 39.9 and his serious heart condition does qualify as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—do not support his release.

7

## I. The Bureau of Prisons has responded to COVID-19 by mitigating the risks from COVID-19 within its facilities.

The Bureau of Prisons has reacted quickly to prevent and combat the spread of COVID-19 within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread. *Id*. The Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from COVID-19, pose the least danger to public safety, and can safely be granted home confinement.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its COVID-19 Action Plan and minimize the risk of COVID-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed August 6, 2020). Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are

isolated from other inmates until testing negative for COVID-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation, https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf (last accessed August 6, 2020). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.*

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from COVID-19 completely at all facilities, despite its best efforts. However, at FCI Morgantown, where Dr. Buzzard is serving his sentence, has only one case of COVID-19 that was detected in a staff member of the facility, who has since recovered. *See* Bureau of Prisons COVID-19 Cases and COVID-19 Inmate Test Information, https://www.bop.gov/coronavirus/ (last accessed August 10, 2020). Accordingly, the Bureau of Prisons' measures have

helped to protect federal inmates from COVID-19 and ensure that Dr. Buzzard and others receive any required medical care during these difficult times.

## II. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

The COVID-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. However, Dr. Buzzard's alleges he is at greater risk of suffering more severe outcomes from COVID-19 based on his hypertension, obesity with a BMI of 39.9-45.5, asthma and heart arrhythmia. The medical records confirm that Dr. Buzzard has a BMI of 39.9; he currently controls his asthma with inhalers; he suffers from hypertension which is controlled by medication; and that he has a history of cardiac arrhythmia. The CDC has identified that people with obesity and serious heart conditions ***are*** at an increased risk from severe illness from COVID-19; and people with asthma and hypertension ***may be*** at an increased risk from severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed August 10, 2020). Given the heightened risk that COVID-19 poses to someone Dr. Buzzard's medical conditions, he meets the "extraordinary and compelling" threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

Nonetheless, even though Dr. Buzzard has shown "extraordinary and compelling reasons", he is still not entitled to compassionate release. Before

10

ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against [the] request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Dr. Buzzard eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Dr. Buzzard was involved in a very extensive opioid distribution conspiracy. He prescribed more than 1.2 million addictive prescription opioid pills, profiting nearly $2,000 - $3,000 per day at the expense of people addicted to opioids. It was clear that had he not been caught, he would not have changed his course of conduct in any way. Being censured by the State licensing board and having to be in a monitoring program did not have any deterrent effect on Dr. Buzzard's medical practice. He did not cease his conduct nor truly change his prescribing habits, he

11

instead implemented policies that provided him an appearance of legitimacy when in fact he was simply continuing to prescribe in an unlawful prescription opioid distribution scheme.

Releasing him now would serve no objectives of the § 3553(a) factors. Unfortunately the COVID-19 pandemic has not had any effect on decreasing the number of opioid pills that are hitting the streets. There are still real risks to public health and safety right now, and undoubtedly will continue for years to come. Those risks will only increase if Dr. Buzzard is released into the community with in ability to practice at some point in the future and place deadly opioids on the street. The Court rightfully considered all the § 3553(a) factors in sentencing Dr. Buzzard to a 72 month term of incarceration. That sentence was just and fair, despite being lower than what the government requested and lower than his sentencing guideline range of 87 to 108 months.

Dr. Buzzard is requesting release after serving only 22 months on his 72 month sentence. As the Court has previously held, allowing a defendant involved in an opioid distribution conspiracy to be released "after only serving about a third of his sentence would not promote respect for the law or proper deterrence, provide just punishment, and avoid unwarranted sentencing disparities." *See Knight*, 2020 WL 3055987, at *3. And the Sixth Circuit has similarly held "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to

12

promote respect for the law permit[s] the court to consider the amount of time served in determining whether a sentence modification is appropriate." *United States v. Kincaid*, 802 F. App'x 187, 188–89.

Dr. Buzzard's conduct had a significant and devastating impact on our community. It was an extremely serious offense that inevitably contributed to the addiction and demise of people, including Raymond Worley, Jr. The 72 month sentence was imposed to reflect the severity of his actions. If he were to be released after serving less than 1/3 of his sentence, this goal of sentencing would be completely lost. *Knight*, 2020 WL 3055987, at *3. Because Dr. Buzzard received a just sentence at the time of sentencing and an early release would not reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, or deter others from committing similar crimes, the § 3553(a) factors weigh against compassionate release.

### III. If the Court were to grant Dr. Buzzard's motion, it should order additional conditions prior to and during a term of supervision.

If the Court were inclined to grant Dr. Buzzard's motion despite the government's arguments above, the government would request that the Court's release order include several provisions. First, the Court should order that Dr. Buzzard be subjected to a 14-day quarantine at his facility, prior to his release. This would minimize any COVID risk of exposure associated with Dr. Buzzard potentially exposing people outside of the prison facility. Second, the Court

13

should impose an eight (8) year term of supervised released that includes a provision that Dr. Buzzard be prohibited from practicing medicine during the term of supervised release. This would at a minimum protect the public from future crimes of Dr. Buzzard practicing medicine for the duration of the original sentence imposed by the Court. Last, and as proposed by Dr. Buzzard, the Court should require at a minimum that six (6) months of the term of supervised release be served on home detention with GPS monitoring during that period.

## CONCLUSION

For the reasons set forth herein, the government respectfully request that the Court deny Dr. Buzzard's Motion for Compassionate Release.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

/s/ Brandy R. McMillion
Brandy R. McMillion
Assistant United States Attorney
211 Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9622
Brandy.McMillion@usdoj.gov

Regina R. McCullough
Assistant United States Attorney
211 Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9618

Dated: August 10, 2020           Regina.McCullough@usdoj.gov

## Certificate of Service

I hereby certify that on August 10, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Mark J. Kriger
645 Griswold Street
Penobscot Building, Suite 1717
Detroit, MI 48226
(313) 967-0100
*Counsel for Defendant Dr. Mark V. Buzzard*

/s/ Brandy R. McMillion
Brandy R. McMillion (P69838)
Assistant United States Attorney
211 Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9622
Brandy.McMillion@usdoj.gov